Reference No. : JT/SPLT/01/X/05

| 1. Place and date | UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS CODE NAME: "SUPPLYTIME 89" PART I | |
|---|---|---|
| Jakarta, 24 October 2005 | | |
| 2. Owners/Place of business (full style, address and telex/Telefax no.) (Cl. 1(a)) | 3. Charterers/Place of business (full style, address and telex/Telefax no.) (Cl. 1(a)) | |
| PT. JAWA TIRTAMARIN<br>Atrium Mulia Building, 3rd Floor, Suite 305<br>Jln. H.R. Rasuna Said Kav. B10-11<br>Jakarta 12910<br>Phone : 62-21-252 0580<br>Fax : 62-21-252 0583<br>Attention : Mr. David James Mills (Regional Manager Asia Pacific) | TAC – PERTAMINA<br>PT. PERTALAHAN ARNEBATARA NATUNA<br>Jln. Imam Bonjol No. 61<br>Jakarta 10310, Indonesia<br>Phone : 62-21-3983 4125 / 3983 4126<br>Fax : 62-21-3983 4126 | |
| 4. Vessel's name (Cl. 1(a)) | 5. Date of delivery (Cl. 2(a)) | 6. Cancelling date (Cl. 2(a) and (c)) |
| AWB. SARKU SAMUDERA | Singapore, 25 October 2005 | 25 October 2005 |
| 7. Port or place of delivery (Cl. 2(a)) | 8. Port or place of redelivery/notice of redelivery (Cl. 2(d)) | |
| Singapore, to be mutually agreed between Charterer and Owner | (i) Port or place of redelivery<br>Owners Nominated Yard, Singapore<br>(ii) Number of days' notice of redelivery<br>Four (4) days | |
| 9. Period of hire (Cl. 1(a)) | 10. Extension of period of hire (optional) (Cl. 1(b)) | |
| Firm Two (2) months with daily extension to be mutually agreed | (i) Period of extension<br>Option to extend on weekly basis with mutual consent to a maximum of 30 days<br>(ii) Advance notice for declaration of option (days)<br>Seven (7) days | |
| 11. Automatic extension period to complete voyage or well (Cl. 1(a)) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i)) | |
| (i) Voyage or well (state which)<br>Voyage<br>(ii) Maximum extension period (state number of days)<br>To be mutually agreed | (i) Lump sum<br>USD 23,000.00<br>(ii) When due<br>Upon signing of the contract<br>13. Port or place of mobilisation (Cl. 2(b)(i))<br>Singapore, to be mutually agreed between Charterer and Owner | |
| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a)) | 15. Number of days' notice of early termination (Cl. 29(a)) | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 29(a)) |
| Amount equivalent to firm charter period or balance of charter hire | Fourteen (14) days | USD 23,000.00 |
| 17. Area of operation (Cl. 5(a)) | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a)) | |
| West Natuna Area, Batam, and Singapore | *To be utilized as drilling support and / or accommodation support barge, within the natural capability of the vessel* | |



(continued) "SUPPLYTIME 89" Uniform Time charter Party for Offshore Service Vessels PART I

**19. Charter hire (state rate and currency) (Cl. 10(a) and (d))**

Daily Charter :
US$ 18,600.00 (United States Dollars Eighteen Thousand and Six Hundred) per day

The above rates are excluding fuel, lube, water, local licenses / operating permits, taxes, domestic shipping license, VAT, Charterer's liability insurance, modifications, vessel clearance, catering telephone satellite charges, agency fees, pilotage, assist tugs & port disbursement.

**20. Extension hire (if agreed, state rate) (Cl. 10(b))**

Same as box 19

**21. Invoicing for hire and other payments (Cl. 10(d))**

(i) state whether to be issued in advance or arrears
Please refer to additional clause no. 44

(ii) state to whom to be issued if addressee other than stated in Box 2
Not Applicable

(iii) state to whom to be issued if addressee other than stated in Box 3
Not Applicable

**22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e))**

STANDARD CHARTERED BANK
Wisma Standard Chartered Bank
Jln. Jenderal Sudirman Kav. 33
Jakarta 10220 – Indonesia
Beneficiary Name : PT. Jawa Tirtamarin
Account No. : 30001094074

**23. Payment of hire, bunker invoices and disbursements for Charterer's account (state maximum number of days) (Cl. 10(e))**

Please refer to additional clause no. 44

**24. Interest rate payable (Cl. 10(a))**

Not Applicable

**25. Maximum audit period (Cl 10(f))**

Twelve (12) months

**26. Meals (state rate agreed) (Cl.6(c)(i))**

Meal : US$ 24.00/man/day
Casual Meal : US$ 8.00 / meal
(for the personnel of the charterer only)

**27. Accommodation (state rate agreed) (Cl. 6(c) (i))**

Included in Box 26

**28. Mutual Waiver of Resource (optional, state whether applicable) (Cl. 12(f))**

Applicable

**29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))**

Under conditions of clause 17 of part II

**30. War (state name of countries) (Cl. 19(e))**

Countries in which the vessel is operating

**31. General average (place of settlement – only to filled in if other than London)(Cl. 21)**

Singapore

**32. Breakdown (state period) (Cl 26(b)(v))**

Twenty Four (24) hours, responsibility of Owner shall be to endeavour to repair only and the rent shall not be paid by Charterers

**33. Law and arbitration (state Cl. 31(a) or 31(b) or 31 (c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)**

Singapore

**34. Numbers of additional clauses covering special provisions, if agreed**

Refer to amendment (seven clauses) – Clause 37–44

**35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)**

TAC – PERTAMINA
PT. PERTALAHAN ARNEBATARA NATUNA
Jln. Imam Bonjol No. 61
Jakarta 10310, Indonesia
Phone : 62-21-3983 4125 / 3983 4126
Fax : 62-21-3983 4126

**36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 28)**

PT. JAWA TIRTAMARIN
Atrium Mulia Building, 3rd Floor, Suite 306
Jln. H.R. Rasuna Said Kav. B10-11
Jakarta 12910
Phone : 62-21-252 0680
Fax : 62-21-252 0683
Attention : Mr. David James Mills (Regional Manager Asia Pacific)

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting PART I, including additional clauses if any agreed and stated in Box 32, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in box 28.

Signature (Owners)
PT. Jawa Tirtamarin

David James Mills
Regional Manager Asia Pacific

Signature (Charterers)
TAC – PERTAMINA
PT. PERTALAHAN ARNEBATARA NATUNA



## PART II "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4 as specified in ANNEX "A" (hereinafter referred to as "the Vessel") for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.
(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(a), but such an option must be declared in accordance with Box 10(b).
(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(b)) in progress, such time not to exceed the period stated in Box 11(a).

**2. Delivery and Redelivery**

(a) Delivery - Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.
(b) Mobilisation - (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13.
(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost.
(c) Cancelling - If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 8, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5, and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.
(d) Redelivery - The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(a) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(b).
(e) Demobilisation - The Charterers shall pay a lump sum without discount in the amount as stated in Box 16 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.

**3. Condition of Vessel**

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A" attached hereto and undertake to so maintain the Vessel during the period of service under this Charter Party.
(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 5.

**4. Survey**

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

**5. Employment and Area of Operation**

(a) The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 18, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. Unless otherwise agreed, the Vessel shall not be employed as a diving platform.
(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences.
(c) The Vessel's Space - The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry so far as space is available and for their purposes in connection with their operations:
(f) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation.

(ii) Lawful cargo whether carried on or under deck.
(iii) Explosive and dangerous cargo whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel, the International Maritime Dangerous Goods Code and/or pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.
(iv) Hazardous and noxious substances, subject to Clause 12(g), proper notification and any pertinent regulations.

(g) Laying-up of Vessel - The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.

**6. Master and Crew**

(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.
(ii) The Master shall sign cargo documents as and in the form presented the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents.
(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units, will operate the machinery on board the Vessel for loading and unloading cargoes, and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.
(c) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment.
(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

**7. Owners to Provide**

(a) The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ship's purposes mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability.
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' expense with any towing and anchor handling equipment specified in Section 5 (b) of ANNEX "A". If during the Charter Period any such equipment becomes lost, damaged or unserviceable, other than as a result of the Owners' negligence, the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense.

**8. Charterers to Provide**

(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise).
(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, cleaning of cargo tanks, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, inert gas required for the protection of cargo, and electrodes used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc. used for offshore works, all hoses connections and adaptors, and further shall refill oxygen/acetylene bottles used for offshore works.
(c) The Charterers shall pay for customs duties, all permits, import duties,



## PART II "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

(including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, both for the Vessel and/or equipment, required for or arising out of this Charter Party.

9. **Bunkers**

Unless otherwise agreed, the Vessel shall be delivered with bunkers and lubricants as on board and redelivered with sufficient bunkers to reach the next bunkering stage en route to her next port of call. The Charterers upon delivery and the Owners upon redelivery shall take over and pay for the bunkers and lubricants on board at the prices prevailing at the times and Ports of delivery and redelivery.

10. **Hire and Payments**

(a) The Charterers shall pay Hire for the Vessel at the rate stated in Box 19 per day or pro rata for part thereof from the time that the Vessel is delivered to and accepted by the Charterers until the expiration or earlier termination of this Charter Party.

(b) *Extension Hire.* – If the option to extend the Charter Period under Clause 1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be mutually agreed between the Owners and the Charterers.

(c) *Adjustment of Hire.* – The rate of hire shall be adjusted to reflect documented changes, after the date of entering into the Charter Party or the date of commencement of employment, whichever is earlier, in the Owners' costs arising from changes in the Charterers' requirements or regulations governing the Vessel and/or its Crew or this Charter Party.

(d) *Invoicing.* – All invoices shall be issued in the contract currency stated in Box 19. In respect of reimbursable expenses incurred in currencies other than the contract currency, the rate of exchange into the contract currency shall be that quoted by the Central Bank of the country of such other currency as at the date of the Owners' invoice. Invoices covering Hire and any other payments due shall be issued pursuant to additional clause no. 44.
~~Notwithstanding the foregoing bunkers and lubricants on board at delivery shall be invoiced at the time of delivery.~~

(e) *Payments.* – Payments of Hire, bunker invoices and disbursements for the Charterers' account ~~shall be received within the number of days stated in Box 23 from the date of receipt of the invoice.~~ Payment shall be made in the contract currency in full without discount to the account stated in Box 22. However any advances for disbursements made on behalf of and approved by the Owners may be deducted from Hire due.

If payment is not received by the Owners within 5 banking days following the due date the Owners are entitled to charge interest at the rate stated in Box 24 on the amount outstanding from and including the due date until payment is received.

Where an invoice is disputed, the Charterers shall in any event pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed portion provided that such portion is reasonably disputed and the Charterers specify such reason. Interest will be chargeable at the rate stated in Box 24 on such disputed amounts where resolved in favour of the Owners. Should the Owners prove the validity of the disputed portion of the invoice balance payment shall be received by the Owners within 105 14 banking days after the dispute is resolved. Should the Charterers' claim be valid, a ~~corrected invoice shall be issued by the Owners.~~

In default of payment as herein specified, the Owners may require the Charterers to make payment of the amount due within 10 banking days of receipt of notification from the Owners; failing which the Owners shall have the right to withdraw the Vessel ~~without prejudice to any claim the Owners may have against the Charterers under the Charter Party.~~

While payment remains due the Owners shall be entitled to suspend the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and Hire shall continue to accrue and any extra expenses resulting from such suspension shall be for the Charterers' account.

(f) *Audit.* – The Charterers shall have the right to appoint an independent chartered accountant to audit the Owners' books directly related to work performed under this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 25, to determine the validity of the Owners' charges hereunder. The Owners undertake to make their records available for such purposes at their principal place of business during normal working hours. Any discrepancies discovered in payments made shall be promptly resolved by invoice or credit as appropriate.

11. **Suspension of Hire**

(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accidents to the Vessel, the Vessel is prevented from working, no Hire shall be payable in respect of any time lost and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:

(i) the carriage of cargo as noted in Clause 5(c)(ii) and (iii);

(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel without the consent or the instructions of the Charterers;

(iii) deviation from her Charter Party duties or exposure to abnormal risks at the request of the Charterers;

(iv) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;

(v) detention or damage by ice;

(vi) any act or omission of the Charterers', their servants or agents.

(b) *Liability for Vessel not working.* – The Owners' liability for any loss, damage or delay sustained by the Charterers as a result of the Vessel being prevented from working by any cause whatsoever shall be limited to suspension of hire.

~~(c) Maintenance and Drydocking. – Notwithstanding sub-clause (a) hereof, the~~ Charterers shall grant the Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter Period for maintenance and repairs including drydocking (hereinafter referred to as "maintenance allowance").
~~The Vessel shall be drydocked at regular intervals. The Charterers shall place the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated~~ by the Owners at a later date) having facilities suitable to the Owners for the purpose of such drydocking.

During reasonable voyage time taken in transits between such Port and Area of operation the Vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance.

Hire shall be suspended during any time taken in maintenance repairs and drydocking in excess of the accumulated maintenance allowance.

In the event of less time being taken by the Owners for repairs and drydocking or, alternatively, the Charterers not making the Vessel available for all or part of this time, the Charterers shall, upon expiration or earlier termination of the Charter Party pay the equivalent of the daily rate of Hire then prevailing in addition to Hire otherwise due under this Charter Party in respect of all such time not so taken or made available.

Upon commencement of the Charter Period, the Owners agree to furnish the Charterers with the Owners' proposed drydocking schedule and the Charterers agree to make every reasonable effort to assist the Owners in adhering to any mutually agreed such predetermined drydocking schedule for the Vessel.

12. **Liabilities and Indemnities**

(a) *Owners.* – Notwithstanding anything else contained in this Charter Party excepting Clauses 5(c)(ii), 7(c), 9(b), 12(g), 15(c) and 21, the Charterers shall not be responsible for loss of or damage to the property of the Owners or of their contractors and sub-contractors, including the Vessel, or for personal injury or death of the employees of the Owners or of their contractors and sub-contractors, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, injury or death is caused wholly or partially by the act, neglect, or default of the Charterers, their employees, contractors or sub-contractors, and even if such loss, damage, injury or death is caused wholly or partially by unseaworthiness of any vessel, and the Owners shall indemnify, protect, defend and hold harmless the Charterers from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury or death.

(b) *Charterers.* – Notwithstanding anything else contained in this Charter Party excepting Clause 21, the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors, ~~including their offshore units,~~ or for personal injury or death of the employees of the Charterers or of their contractors and subcontractors (other than the Owners and their contractors and sub-contractors) or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused, wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel, and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death.

(c) *Consequential Losses and Damages.* – Neither party shall be liable to the other for, and each party hereby agrees to protect, defend and indemnify the other against, any consequential losses and damages whatsoever, whether direct or indirect, arising out of or in connection with the performance or non-performance of this Charter Party, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance, whether or not foreseeable at the date of execution of this Charter Party.

(d) *Limitations.* – Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party.

(e) *Himalaya Clause.* – (i) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sub-contractors, clients, joint venturers and joint interest owners (always with respect to the job or project on which the Vessel is employed); their respective employees and their respective underwriters.

(ii) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies, the Owners' sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator, its demise charterer(s), their respective employees and their respective underwriters.

(iii) The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties.

(f) *Mutual Waiver of Recourse* (Optional, only applicable if stated in Box 26, but regardless of whether this option is exercised the other provisions of Clause 12 shall apply and shall be paramount)

In order to avoid disputes regarding liability for personal injury or death of employees or for loss of or damage to property, the Owners and the Charterers have entered into, or by this Charter Party agree to enter into, an Agreement for Mutual Indemnity and Waiver of Recourse (in a form substantially similar to that specified in ANNEX "C") between the Owners, the Charterers and the various contractors and sub-contractors of the Charterers.

(g) *Hazardous and Noxious Substances.* – Notwithstanding any other provision of this Charter Party to the contrary, the Charterers shall always be responsible for any losses, damages or liabilities suffered by ~~the Owners, their employees, contractors or sub-contractors,~~ by the Charterers, or by third parties, with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous and noxious substances in whatever form as ordered by the Charterers, and the Charterers shall defend, indemnify the Owners, and hold the Owners harmless for any expense, loss or liability whatsoever or howsoever arising with respect to the carriage of hazardous or noxious substances.




## PART II "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**13. Pollution**

(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of actual or potential pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause any such pollution or allow discharge, spills or leaks from the Vessel, except as may emanate from cargo thereon or therein.

(b) The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or potential pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors or by the unseaworthiness of the Vessel.

**14. Insurance**

(a)(i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners.

(ii) The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(a)(ii)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party.

(b) Five days prior to delivery, tThe Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party.

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party.

**15. Saving of Life and Salvage**

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services.

All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owner against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub-clause, and time taken for such repairs shall not count against time granted under Clause 11 (c).

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

**16. Lien**

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the vessel.

**17. Sublet and Assignment**

a) Charterers. - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel. Notwithstanding the foregoing the Charterer shall have the right to sublet the Vessel to an affiliated company of the Charterer without the prior written consent of the Owners.

(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 20 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers.

(c) Owners. - The Owners may not assign or transfer any part of the Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

**18. Substitute Vessel**

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, which complies with the requirements of Annex A, subject to the Charterers' prior approval which shall not be unreasonably withheld. This provision also apply in the event during the term of Hire, the Charterers request the Owner to provide a substitute vessel.

**19. War**

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or ruler.

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks.

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war (whether there be a declaration of war or not) either the Owners or the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART I if it has cargo on board after discharge thereof at destination or, if debarred under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if the Vessel has no cargo on board, at the port or place at which it then is or if at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery.

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed a deviation.

The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause.

**20. Excluded Ports**

(a) The Vessel shall not be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel, (b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions.

(c) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand




## PART II "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

**21. General Average and New Jason Clause**

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

**22. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

**23. Structural Alterations and Additional Equipment**

The Charterers shall have the option of, at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment.

**24. Health and Safety**

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' instructions as may be appended hereto. See Annex D

**25. Taxes**

Each party shall pay taxes due on its own profit, income and personnel. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.

In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly.

**26. Early Termination**

(a) *For Charterers' Convenience.* - The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement stated in Box 14 and the demobilisation charge stated in Box 16, as well as Hire or other payments due under the Charter Party.

(b) *For Cause.* - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances:

(i) *Requisition.* - If the government of the State of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) *Confiscation.* - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.

(iii) *Bankruptcy.* - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.

(iv) *Loss of Vessel.* - If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) *Breakdown.* - If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute Vessel pursuant to clause 18.

(vi) *Force Majeure.* - If a force majeure condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days.

(vii) *Default.* - If either party is in repudiatory breach of its obligations hereunder.

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments due.

**27. Force Majeure**

Neither the Owners nor the Charterers shall be liable for any loss, damage or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners' or the Charterers' employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.

**28. Notices and Invoices**

Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate.

**29. Wreck Removal**

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.

**30. Confidentiality**

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data.

**31. Law and Arbitration**

*) (a) This Charter Party shall be governed by Singapore law and any dispute arising out of this Charter Party shall be referred to arbitration in Singapore, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

*) (b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.

(c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.

(d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply.

*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33.

**32. Entire Agreement**

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

**33. Severability Clause**

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken out and the remainder of this Charter Party shall continue in full force and effect.

**34. Demise**

Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.

**35. Definitions**

"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof.

"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production.

"Offshore site" is defined for the purpose of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers.

"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.

**36. Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.





**ANNEX "A" to Uniform Time Charter Party for Offshore Service Vessels**
Code Name: "SUPPLYTIME 89" – dated 10 November 2003

## VESSEL SPECIFICATION

Please refer to vessel specification attached

**1 General**

(a) Owner: Name:
Address:

(b) Operator: Name:
Address.

(c) Vessel's Name: Builder:

(d) Year Built:

(e) Type:

(f) Classification/ Society:

(g) Flag:

(h) Date of nx schd DD:

**2 Performance**

(a) Certified Bollard Pull (Tonnes)

(b) Speed/consumption (non-towing)
(Approx. Daily Fuel Consumption)
(Fair Weather)

Max Speed: Kts (app) Tonnes

Svc Speed: Kts (app) Tonnes

Stby (M/E secured) Tonnes

(c) Approx Towing/Working Fuel Consumption
Engine Power 100% Tonnes

(d) Type(s) and Grade(s) of fuel used:

**3 Dimensions and Capacities/Discharge Rates:**

(a) LOA Breadth Depth
Max draught (m)

(b) Deadweight (MT):

| | | Discharge Rate | |
|---|---|---|---|
| (c) Cargo FO | /hr at | | Hd |
| (d) Drill water | /hr at | | Hd |
| (e) Potable | /hr at | | Hd |
| (f) Dry bulk | /hr at | | Hd |
| (g) Liquid mud (max SG) | /hr at | | Hd |

State type of recirculation system i.e. mechanical agitation, centrifugal pumps etc.

(h) Cargo deck area: Cap (mt):
L (m) x B (m):
Load bearing cap:

(i) Heavy weight brine ($m^3$/barrels):
(max SG): /hr at hd

**4 Machinery**

(a) BHP M/E:

(b) Engine builder:

(c) No.of Engines/type:

(d) Generator:

(e) Stabilisers:

(f) Bow Thruster(s):

(g) Stern Thruster(s):

(h) Propellers/rudders:

(i) No.& press rating of bulk compressors:

(j) Fuel oil metering system:

**5 Towing and Anchor Handling Equipment**

(a) (i) Stern Roller (dim):
(ii) AH/towing winch:
(iii) Rig chain locker cap (linear feet of 3" chain)
(iv) Tugger winches:
(v) Chain stopper make/type:

(b) (i) Towing wire:
(ii) Spare towing wire:
(iii) Work wire:
(iv) Spare work wire:
(v) Other A/H eqpmt (eg Pelican hook/shackle/stretcher etc)

**6 Radio and Navigation Equipment**

(a) Radios
Single side band:
VHF:
Satcom:

(b) Elec Nav Eqpmt:

(c) Gyro:

(d) Radar:

(e) Autopilot:

(f) Depth sounder:

**Multipurpose Tanks yes/no:*

*p.t.o.*



*(continued)*

**ANNEX "A"**

**VESSEL SPECIFICATION**
**Please refer to the specification attached**

**7 Fire Fighting Equipment**
(a) Class (FF1, FF2, FF3, other):
(b) Fixed:
(c) Portable:

**8 Accommodation**
(a) Crew: (b) Passengers:

**9 Galley**
(a) Freezer space ($m^3$):
(b) Cooler ($m^3$):

**10 Additional Equipment**
(a) Mooring Equipment:
(b) Joystick:
(c) Other:

**11 Standby/Survivor Certificate** Yes/No
Nos:






SARKU
MARINE SDN BHD (156370-K)
A MEMBER OF SAPURA GROUP OF COMPANIES

SAPURA
ENERGY

[illegible]

*NAME*
- SARKU SAMUDERA

*YEAR BUILT*
Built in 1983

*OWNER/ OPERATOR*
Sarku Marine Sdn Bhd

*CLASSIFICATION*
American Bureau of Shipping (ABS) Class A1 Barge

*FLAG/ REGISTRATION*
- Malaysia / Kuching

*LIVING ACCOMMODATION*
Fully air-conditioned for 210 personnel

*CRANAGES*
- Main Crane – Amhoist 11760 Pedestal crane. Rated capacity 116 MT@8.5m(28ft.) radius. Boom Length 45.71m (150 ft)
  Operation Crane – FMC Link Belt ABS 105 B Pedestal crane rated capacity 22 MT@6.1m (20ft) radius. Boom length 24.4 m (80 ft)

*DIMENSIONS*

| | |
|---|---|
| Overall Length | 102.7m |
| Length at water line | 85.3 m |
| Breadth | 21.3 m |
| Depth at main deck | 11.6 m |
| Draught (maximum loadline) | 5.5 m |

*DECK SPACE*
Uninterrupted Clear Deck Space 900 m²

*TANK CAPACITY*

| | |
|---|---|
| Portable Water | 760 MT |
| Fuel Oil | 824 MT |

*MOORING SYSTEM*
8 Point Mooring
Drum / Winches - Four(4) each BRISSONNEAU & LOTZ Double drum Electrically driven 85 kW-440 volts – 60 hz and Monitor by CCTV System
Anchor - Eight (8) each STEVPRIS 7,000kg
Anchor Wires - Galvanised, size: 57mm Length: approximated 1,030 m

*MACHINERY*
- Main Generator - Two (2) unit CATERPILLAR D399 BC
  Emergency Generator – GENERAL ELECTRIC AC Generator 275 Kw / 340 Kva
  Permanent Equipment
  - One(1) Water Maker ATLAS DENMARK, capable of producing 600 gpm of potable water.
    One(1) Aqua Chem S-300, capable of producing max. 20 tons per day.
  - Three (3) units Air Compressors INGERSOLL RAND Capacity 350 cfm @ 125 psi
  - One(1) unit Hamworthy Oily Water Separator capable of treating 2.5 cu.m./hr @15ppm

*LIFE SAVING*

| | |
|---|---|
| Life Boats | Two (2) unit totally enclosed WATERCRAFT, Capacity 60 men each, Davit Type SCHAT WATERCRAFT |
| Life Rafts | Twelve (12) units at main deck level. Capacity 25 men each |
| Life Jackets | USCG approved life jackets; 420 pieces |
| Breathing Apparatus | (MSA/SCBA) 12 units |
| Personnel Basket | Two BILLY PUGH 72" diameter personnel transfer basket |

*SAFETY EQUIPMENT*
- Fire, Gas Detection & Alarms
  - Heat Sensor located in the engine room, mud pump room, MCC room, paint locker, galley
  - Smoke Detectors located in the accommodation, MCC room, store room, galley
  - Alarm Panel - Fire alarm panel located in radio room
  - Fire & Gas Detection - Fire alarm control panel – Minerva marine/ THORN Model – T1016
- Fire Fighting Equipment

| | |
|---|---|
| Firewater Main | 20 stations are distributed throughout the barge |
| $CO_2$ Protection | The emergency generator room, engine room, control room and paint lockers are protected by $CO_2$ System. The Helideck area is protected by Foam System |
| Sprinkler System | Water sprinkler network of pipes is filled with pressured water at accommodation area. |
| Portable Fire Extinguishers | Different types of extinguishers are distributed throughout the vessel as per regulation |
| Fire Suit | 2 located on the Helideck |

*COMMUNICATION EQUIPMENT*
- 2 International Marine VHF SSB
  1 Satellite Communication INMARSAT
  1 Radar

| | |
|---|---|
| Telephone (internal) | Forty four (44) Betacom-Chorus in use |
| PA System | MF/HF Marine 2 x ICOM HF-SSB Radio. |
| VHF Marine | 2 x ICOM VHF radio |
| Transceiver | Rx 156 – 163 Mhz, Tx 156 – 157 mhz |

Others: Air Sea Radio, Fax machine

*HELIDECK*
27.4 m x 21.3 m Steel Deck and capable of supporting S-61N Helicopter

[illegible]

Head Office, Kuala Lumpur

Tingkat Satu, Bangunan Sapura, Jalan Enggang, Ulu Klang 54200, Kuala Lumpur, Malaysia

Tel : 603-4257 8182 Fax : 603-4257 8146 E-mail: sarku@po.jaring.my

Operation Office, Miri, Sarawak

2nd Floor, Lot 806, Block 4, Bgn. Slipway MCLD, Piasau Industrial Estate, P.O.Box 1319, 98008 Miri, Sarawak. Malaysia

Tel : 6085-661122 Fax : 6085-661133 E-mail: sarku@po.jaring.my




GENERAL ARRANGEMENT



SARKU SAMUDERA

ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated 10 November 2003

## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.* - Hull and Machinery insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.* - Protection and Indemnity or Marine Liability insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or USD6 million, whichever is

greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless Carried elsewhere).

(3) *General Third Party Liability Insurance.* - Coverage shall be For:
Bodily Injury .......................................... per person
Property Damage .......................................... per occurence

(4) *Workmen's Compensation and Employer's Liability Insurance for Employees.* - Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may Become legally obliged to pay benefits.

(5) *Comprehensive General Automobile Liability Insurance.* - Covering all owned, hired and non-owned vehicles. coverage shall be for:
Bodily Injury According to the local law
Property Damage In an amount equivalent to ________ single limit per occurrence

(6) Such other insurances as may be agreed.



**ADDITIONAL CLAUSES**
**SUPPLYTIME 89 UNIFORM TIME CHARTER PARTY**
**FOR OFFSHORE SERVICES VESSEL**

| | |
|---|---|
| Between Charterer | : TAC-PERTAMINA, PT. Pertalahan Amebatara Natuna |
| and Owner | : PT. Jawa Tirtamarin |
| Per contract Ref. No. | : JT/SPLT/01/X/2005 |
| Name of Vessel | : AWB. "SARKU SAMUDERA" |

37. All communication including e-mail shall be charged at cost plus 10% including handphone, satellite, email and fax. Vessels email system may not be used without prior permission of the officer of the watch.

38. Potable water, fuel and lubricant oil shall be charged at cost reimbursable OR Charterer's supply.

39. All permits, licenses, pilotage, assist tug, port disbursement, permission etc shall be arranged by Charterer with full support from Owner. Vessel shall continue on hire in the even of any dely resulting therefrom. Charterer's liability insurance should be for Charterer's account.

40. Garbage removal and food supply run shall be provided by the Charterer free of charge.

41. Visa for crews and all offshore transportation for crew change shall be arranged by and be to Charterer's account.

42. Any modifications required to be made to the vessel by Charterer prior to or during the chartering period shall be reinstated by Charterer whilst vessel remain on hire.

43. All rates quoted are inclusive withholding tax 1.2% and excluding VAT.

44. Terms of payment :
    a. Charter Hire
        - Fifteen (15) days payment in advance when signing contract
        - Fifteen (15) days payment in advance when AWB "Sarku Samudera" arrives at job location (Natuna)
        - The rest of paymet should be paid every 15 (FIFTEEN) days in advance.

    b. Mobilization Cost
    The amount of USD 23,000.00 for Mobilization cost should be paid when signing contract.

    c. Demobilization Cost
    The amount of USD 23,000.00 for Demobilization cost should be paid when vessel Off Hired

    d. Payment of bunkers :
    Immediate upon receipt of invoice

