# AT THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

## IN THE MATTER OF AN ARBITRATION
## UNDER THE INTERNATIONAL ARBITRATION ACT (CAP 143A)

### ARB No. 050 of 2006

Between

## PT JAWA TIRTAMARIN
### *(Claimants)*

And

## PT PERTALAHAN ARNEBATARA NATUNA
### *(Respondents)*

---

### AWARD

---

Dated this 13th day of July 2007



Registered in SIAC Registry of Awards as:
**Award No. 18 of 2007**
on 13 July 2007

**AT THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE**

**IN THE MATTER OF AN ARBITRATION**
**UNDER THE INTERNATIONAL ARBITRATION ACT (CAP. 143A)**

ARB NO. 050 OF 2006

Between

**PT JAWA TIRTAMARIN**

*(Claimants)*

And

**PT PERTALAHAN ARNEBATARA NATUNA**

*(Respondents)*

# A W A R D

## I.    INTRODUCTION

1. This is an *ad hoc* arbitration governed by the International Arbitration Act of Singapore (Cap 143A). The Claimants, PT Jawa Tirtamarin, as well as the Respondents, PT Pertalahan Arnebatara Natuna, are both companies incorporated in Indonesia and have their respective places of business at Atrium Mulia Building, 3rd Floor, Suite 306 Jl. HR. Rasuna Said Kav. B10-11, Jakarta 12910, Indonesia and Bumidaya Plaza 21st & 23rd Floor, Jalan Imam Bonjol No. 61, Jakarta 10310, Indonesia.

2.    This arbitration is in respect of various disputes which have arisen out of a time charterparty on SUPPLYTIME Form dated 24 October 2005 entered into by the parties ("the Charter") in respect of the barge, "AWB Sarku Samudera" ("the Vessel").

3.    Box 33 of the Charter provides that the law and arbitration shall be "Singapore". In addition, Clause 31(a) of the Charter provides that:-

        "The Charter Party shall be governed by Singapore law and any dispute arising out of this Charter shall be referred to arbitration in Singapore."

4.    Notice of arbitration was given pursuant to the above provisions by the Claimants' solicitors, M/s Engelin Teh Practice LLC on 11 May 2006 to the Respondents. I was appointed arbitrator by the Singapore International Arbitration Centre ("SIAC") vide a letter of appointment dated 18 August 2006.

5.    I held a preliminary meeting on 15 September 2006, advance notice of which was given to the parties on 6 September 2006. However, only the Claimants attended the preliminary meeting. I gave the following directions at the meeting:-

        (a)    The Statement of Case (which is to be particularized) is to be delivered on 13 October 2006;

(b)    The Statement of Defence (which is to be particularized) and Counterclaim (if any and also to be particularised) is to be delivered by 10 November 2006;

(c)    Reply (which is to be particularized) and/or Defence to Counterclaim (which is to be particularized) to be delivered by 24 November 2006.

The directions were notified in writing to the parties.

6.    On 11 October 2006, the Claimants filed their Statement of Case, which was subsequently amended on 23 January 2007. The Respondents did not file their Statement of Defence. On 16 October 2006, through their lawyers, M/s Yan Apul & Rekan Law Office, the Respondents informed the Tribunal that they objected to the arbitration being carried out in Singapore due to an absence of connecting factors although in the same letter, they acknowledged that the Charter executed by them contains an agreement to subject disputes to arbitration in Singapore.

7.    On 21 December 2006, I held a second preliminary meeting at which I made the following directions:-

(a)    Parties are to exchange the List of Documents within 4 weeks from today i.e. on or before 18 January 2007. Parties are also to provide to the Tribunal copies of documents which are referred to in their respective List of Documents.

(b)     Parties are to exchange witness statements within 6 weeks after the exchange of the List of Documents i.e. on or before 1 March 2007.

(c)     The hearing of this Arbitration is fixed for two days and will take place on 29 and 30 March 2007 at the SIAC.

These directions were also notified in writing to the parties.

The Claimants filed their List of Documents on 18 January 2007; the Respondents did not file any List of Discovery.

8.     On 26 February 2007, Mr Goh Chan Chee ("Goh") filed a witness statement on behalf of the Claimants.  No witness statement was filed on behalf of the Respondents.

9.     The hearing took place on 29 March 2007.  The Claimants were represented by Mr Thomas Sim of M/s Engelin Teh Practice LLC.  Goh gave evidence on behalf of the Claimants.  The Respondents did not participate in the hearing; neither were they represented at the hearing by counsel.

10.    At the hearing, the Claimants put forward the following documents to substantiate two heads of damage which they are claiming under:-

(a)     Copies of the permits which are the subject of the claim for permit processing fees in the Debit Note No. 005/JT/DN/I/2006 dated 18 January 2006;

(b)    Copies of documents showing that the Respondents operated the Udang Fields which relates to the claim for the cost of the 85-tonne shackle in Debit Note No. 007/JT/DN/I/2006 dated 24 January 2006.

11.    Pursuant to my directions, copies of these documents were forwarded by the Claimants to the Respondents on 30 March 2007.   The Respondents responded by email on 3 April 2007 to these additional documents.  By a letter dated 4 April 2007, M/s Engelin Teh Practice LLC confirmed that the Claimants did not wish to reply to the Respondents' response of 3 April 2007. In the same letter, they enclosed English translation of the additional documents referred to in Paragraph 10 above.

12.    After reviewing the witness statement of Goh, hearing his evidence on 29 March 2007 as well as reviewing the documents put forward to the Tribunal (including any translations thereof), I make the following findings and conclusions, which I am entitled to even though the Respondents did not participate in the hearing despite having been given sufficient notice of the hearing and opportunity to present their case.  This is so as Article 25(c) of the UNCITRAL Model Law on International Commercial Arbitration, which is scheduled to the International Arbitration Act of Singapore, provides that where any party fails to appear at a hearing or to produce documentary evidence without showing sufficient cause, the Arbitral Tribunal may continue with the proceedings and make an award based on the evidence before it.

## II.    THE MATERIAL FACTS

13.    As aforesaid, the parties entered into a time charter on SUPPLYTIME Form (with amendments thereto and rider clauses) on 24 October 2005 in respect of the Vessel.  Under Box 9 of the Charter, the Charter was for two months with daily extensions to be agreed.  Box 10, in contrast, provides for an "option to extend on a weekly basis by mutual consent" up to a maximum of 30 days.

14.    The Vessel was delivered by the Claimants pursuant to the Charter to the Respondents on 25 October 2005. Accordingly, her charter period would have come to an end on or about 24 December 2005. However, according to Goh, the parties agreed to extend the Charter by just under 30 days.  The Vessel was eventually re-delivered to the Claimants on 18 January 2006.

## III.    THE VARIOUS HEADS OF CLAIM PUT FORWARD BY THE CLAIMANTS

15.    The Claimants' case is in essence that at the end of the Charter, the Respondents, in breach of various provisions of the Charter, failed to effect payment of various outstanding sums to the Claimants. The various outstanding sums, which I shall describe as heads of claim hereinafter, are set out in a tabular form in Tab 2 of the Claimants' Bundle of Documents ("the Claims Table").

16.    I shall now set out my findings and conclusions on both liability and quantum in respect of each head of claim which the Claimants have put forward in the Claims Table.

## A.    CHARTER HIRE FOR THE PERIOD OF 9 TO 24 NOVEMBER 2005 AT 0800 HOURS

17.    Clause 10(a) of the Charter, when read with Box 19 thereof, provides, *inter. alia*, that the Respondents should pay hire for the Vessel at the rate of US$18,600 per day excluding "fuel, lube, water, local licenses / operating permits, taxes, domestic shipping license, VAT, Charter's liability insurance, modifications, vessel clearance, catering telephone satellite charges, agency fees, pilotage, assist tugs & port disbursement".

18.    As aforesaid, the Vessel was delivered to the Respondents on 25 October 2005 and remained under the Respondents' employment until 18 January 2006 when it re-delivered to the Claimants.  As such, pursuant to Clause 10(a) read with Box 19, the sum of US$18,600 per day was payable as charter hire for the 15 day period from 9 to 24 November 2005 at 0800 hours. This period was, according to Goh, the second 15 day period under the Charter. The total hire payable for the said period is US$279,000. An invoice for this amount plus VAT of 10% of this amount (the latter amounting to US$27,900) bearing reference of 063/JX/X/2005 was rendered by the Claimants to the Respondents. So far as the VAT of 10% is concerned, Rider Clause 43 read with Box 19 of the Charter makes it clear that the daily hire rate of US$18,600 is exclusive of VAT.  According to Goh, whose evidence I accept, this invoice was not disputed by the Respondents.

19.  Goh's unchallenged evidence which I accept is that the sum of US$279,000 plus VAT of 10% of that sum (thereby totalling US$306,900) was not paid by the Respondents. I find that this failure to effect payment of the charter hire for the period of 9 to 24 November 2005 amounts to a breach of Clause 10(a) read with Box 19 of the Charter. I accordingly conclude that the Claimants are entitled to recover the sum of US$306,900 from the Respondents.

## B.    CATERING CHARGES FOR PERSONNEL ON BOARD THE VESSEL

20.  An invoice bearing reference 155/JT/DN/XI/2005 for the sum of US$2,784 was sent by the Claimants to the Respondents in respect of the above charges from 29 to 31 October 2005. According to Goh, this outstanding invoice was not disputed. Attached to this invoice is another invoice issued by Sarku Engineering Services Sdn Bhd, whom Goh clarified to be the head owners of the Vessel (hereafter, "the head owners"), for a similar amount. It therefore appears to be that the Claimants were seeking to claim from the Respondents what they had to pay to the head owners.

21.  That having been said, the terms of the Charter oblige the Respondents as charterers to pay for the meals of persons other than crew members at the rate(s) stated in Box 26: see Clause 5(c)(i). Box 26 provides that a sum of US$24 is chargeable daily for each man for meals provided.

22.  On the basis of the foregoing provisions, the Respondents were required under the Charter to pay the sum of US$2,784 for catering charges incurred in respect of the period of 29 to 31 October 2005. The breakdown of this figure is set out in the invoice issued by the head owners. I find the

Respondents acted in breach of the Charter in failing to effect payment of this sum, which I accordingly hold the Claimants are entitled to.

23. During the arbitration, Goh informed the Tribunal that there was a settlement reached between the Claimants and the head owners in respect of this head of damage. However, that was an arrangement strictly between those two parties. It does not exonerate the Respondents from fulfilling its contractual obligations under Clause 5(c)(i) read with Box 26.

## C.   CATERING CHARGES FOR THE MONTHS OF NOVEMBER 2005, DECEMBER 2005 AND JANUARY 2006

24. An invoice bearing reference 004/JT/DN/I/2006 for the sum of US$38,560 was issued by the Claimants to the Respondents in respect of catering charges incurred for the month of November 2005. Attached to this invoice is another invoice prepared by the head owners for the same sum. So far as the latter invoice is concerned, a sum of US$8,680 was charged by the head owners for casual meals at the rate of US$8 per meal. Under Box 26 of the Charter, casual meals of US$8 per meal were only meant to be supplied to "personnel of the charterer only". The invoice issued by the Claimants state that the charges were for "PT Pan representative on board" the Vessel. "PT Pan" is in all probability and I so find, an abbreviation for PT Pertalahan Arnebatara Natuna, ie. the Respondents. According to Goh, this invoice has not been challenged by the Respondents. I therefore find that the sum of US$8,680 claimed against the Respondents were justified in light of Box 26.

25. I turn now to the remaining sum of US$29,880. The terms of the Charter also oblige the Respondents as charterers to pay for the meals of persons other

than "crew members" at the rate(s) stated in Box 26: see Clause 5(c)(i).  Box 26 provides that a sum of US$24 is chargeable daily meals provided to each of such persons.    Looking at the Summary of Daily Meal Records for November 2005 [Tab 7, Claimants' Bundle of Documents], it appears to the Tribunal that daily meals were supplied to the "construction / operation crews" which refers to "all the project crew who (sic) assigned by PT Pan representative".  The construction / operation crews would not be the same as the crew of the Vessel, which is what I construe "crew members" in Clause 5(c)(i) to mean.  Accordingly, I hold that the Claimants are entitled to claim the balance sum of US$29,880 from the Respondents.

26.    On the basis of the foregoing provisions, the Respondents were required under the Charter to pay the sum of US$38,560 for catering charges incurred for the month of November 2005.  I find the Respondents acted in breach of the Charter in failing to effect payment of this sum and that the Claimants are entitled to recover this sum from the Respondents.

27.    An invoice bearing reference 024/JT/DN/II/2006 for the sum of US$39,728 was issued by the Claimants to the Respondents in respect of catering charges incurred by PT Pan's representatives for the month of December 2005.  Just like invoice No. 004/JT/DN/I/2006, attached to this invoice is another invoice prepared by the head owners for the same sum.  The head owners' invoice indicates that the amount chargeable for daily meals and casual meals supplied pursuant to rates that are similar to those stipulated in Box 26.  I repeat my finding that "PT Pan" is an abbreviation for the Respondents.  Accordingly, insofar as casual meals were charged to the Respondents at the rate of US$8 per meal, these are justified by virtue of the

fact that the charterers are liable for casual meals supplied to their personnel pursuant to Box 26 of the Charter. US$9,200, the sum incurred for casual meals for the month of December 2005 is therefore due to the Claimants from the Respondents.

28.    As stated above, the terms of the Charter oblige the Respondents as charterers to pay for the meals or persons other than crew members, at the rates stated in Box 26: see Clause 5(c)(i). Box 26 further provides that a sum of US$24 is chargeable daily meals for each man. There is a balance sum of US$27,930. From the Summary of Daily Meal Records for December 2005 [Tab 11, Claimants' Bundle of Documents], these meals were supplied to "construction / operation crews". Adopting the analysis set out above, I am of the view that these meals were supplied to persons other than "crew members" and accordingly, hold that the Respondents are liable for this sum of US$27,930.

29.    Pursuant to the foregoing provisions, the Respondents were required under the Charter to pay the sum of US$39,728 to the Claimants for catering charges incurred for the month of December 2005. In failing to effect payment of this sum, the Respondents acted in breach of the Charter and I accordingly hold that the Claimants are entitled to recover this sum.

30.    An invoice bearing reference 031/JT/DN/II/2006 for the sum of US$16,368 was issued by the Claimants to the Respondents in respect of catering charges incurred from 1 to 15 January 2006. Like the two invoices referred to above for catering charges, this invoice also attaches an invoice issued by the head owners for the same sum. This invoice of US$16,368 was for catering

charges for the Respondents' representative i.e. PT Pan Representative on board the Vessel for the said period.

31. Based on similar reasoning as set out in the paragraphs under this heading and pursuant to Clause 5(c)(i) read with Box 26 of the Charter, the Respondents were required to pay this sum of US$16,368 for catering charges incurred for the period of 1 to 15 January 2006. I find the Respondents acted in breach of the Charter in failing to effect payment of this sum and hold that the Claimants are entitled to recover it from the Respondents.

## D. CHARTER HIRE FOR 6.5 DAYS AND DE-MOBILISATION CHARGES

32. According to Goh, this head of claim was for the hire that was payable for the period of 31 December 2005 at 2000 hours to 7 January 2006 at 0800 hours at the daily charter rate of US$18,600. This period of 6.5 days was for an initial (but not the complete) extension; in fact, the Charter stretched till 18 January 2006.

33. The invoice bearing reference no. 610/JT/I/2006 for, *inter alia*, the charter hire of US$120,900 was not challenged by the Respondents. Factoring in 10% VAT, the amount that would be payable by the Respondents pursuant to Clause 10(a) read with Box 19 is US$132,990. I should add that the hire for the extended period remained at US$18,600 per day by virtue of Box 20 of the Charter. I accordingly find that the Respondents were obliged to pay the sum of US$132,990 to the Claimants and in failing to effect such payment, acted in breach of the Charter.

34    This invoice also includes a sum of US$23,000 for demobilisation charges. Clause 2(e) of the Charter read with Box 16 stipulates that a sum of US$23,000 is payable by the charterers on demobilisation of the Vessel. However, as Goh explained during the hearing, the Vessel was not in fact re-delivered on 7 January 2006. She was in fact re-delivered on 18 January 2006. As the mobilisation did not take place at the end of *this extension*, the invoicing of this sum of US$23,000 is premature. I note that the Claimants have not claimed for this amount under any other head apart from this. That having been said, when the Vessel was re-delivered, demobilisation charges would have been incurred and be payable under Clause 2(e) read with Box 16. As is referred to below, the invoice which covers the hire from 7 to 18 January 2006 (when the Vessel was re-delivered) did not include a charge for demobilisation. There is therefore no question of double-charging on the part of the Claimants. The only defect appears to be one of premature invoicing for this item. Given Goh's explanation that when the Charter was extended to 7 January 2006 initially, they had expected the Charter to come to an end by then. Seen in this light, the early invoicing is understandable. I accordingly allow this claim of US$23,000.

## E.    TELEPHONIC AND COMMUNICATION CHARGES

35.    The charges were incurred for the month of November 2005 and amount to US$438.09. An invoice for this amount bearing reference 003/JT/DN/I/2006 was rendered to the Respondents and according to Goh, that invoice has not been disputed.

36.     Under Rider Clause 37 of the Charter, all communication "shall be charged at cost plus 10% including handphone, satellite, email and fax". Although this provision does not expressly state that the charterers shall bear these charges, nevertheless, I am of the view and so find that this must have been the intention of the parties, as a matter of construction of this provision read with Box 19. This is so because under Box 19, the daily hire of US$18,600 does not include telephone and satellite charges, which under Rider Clause 37 would be charged at cost plus 10%. If these charges were to be absorbed by the Claimants as part of the hire, Rider Clause 37 and the exclusionary remarks in Box 19 would be completely meaningless, indeed even superfluous. For completeness, I note that it appears that the Claimants have not in fact claimed the additional 10% even though they were entitled to under this provision.

37.     In failing to pay this amount, the Respondents acted in breach of Rider Clause 37 of the Charter. I accordingly find that the Claimants are entitled to recover the sum of US$438.09 under this head of claim.

## F.    CHARTER HIRE FOR THE PERIOD OF 7 JANUARY 2006 AT 0800 HOURS TO 18 JANUARY 2006 AT 2000 HOURS

38.     As mentioned above, after the initial extension, the charter period was further extended from 7 January 2006 at 0800 hours to 18 January 2006 at 2000 hours. An invoice covering the charter hire for this period bearing reference 012/JT/I/2006 was rendered to the Respondents. It was for the sum of US$227,187.84 (which consists of the hire amount of US$206,534.40 plus a 10% VAT component, which by Rider Clause 43 is not included in the daily hire rate of US$18,600). No demobilisation charges were included in this

email.  Goh's evidence at the hearing was that this invoice was not challenged by the Respondents.

39.    Pursuant to Clause 10(a) read with Boxes 19 and 20 of the Charter, a daily hire rate of US$18,600 was payable by the Respondents to the Claimants for this period.  Failure on the part of the Respondents to effect payment of the hire for the period of 7 January to 18 January 2006 amounts to a breach by the Respondents of these provisions.  I accordingly hold that the Respondents are entitled to pay the sum of US$227,187.84.

## G.    CHARGES FOR PROCESSING SEACOM PERMITS, IMPORTATION PERMIT AND CREW PERMIT

40.    An invoice for the sum of Rp102,300,000 bearing reference 005/JT/DN/1/2006 was rendered by the Claimants and addressed to the Respondents in respect of the above claim.  At the hearing, the Claimants tendered documents which were marked as Annex 9A further in support of this head of claim.  The documents in Annex 9A are in Bahasa Indonesia; as aforesaid, copies of translation of these documents were supplied to the Tribunal on 4 April 2007.  The Respondents were invited by me to respond to these additional documents and did so by way of an email on 3 April 2007.  The Claimants replied briefly to the Respondents' email of 3 April 2007 the following day.

41.    I have considered the translations of the documents in Annex 9A.  They demonstrate that:-

(a)    temporary immigration permits were granted by the Indonesian Department of Justices and Human Rights to the experts, captain and crew of the Vessel;

(b)    exemption of import duties was granted by the Indonesian Ministry of Finance in respect of the Vessel;

(c)    approval for exemption for flag requirement was given by the Indonesian Directorate of Sea Communications in respect of the Vessel.

42.    However, no evidence has been adduced before me that these steps taken by the Claimants were carried out at the request of the Respondents. The matters which are covered by these permits, exemptions and approvals are not exclusive to or consequential upon the performance of the Charter. The period referred to in the approvals, permits and exemptions in some instances extended beyond the expiry of the Charter. Clause 8(c) of the Charter which the Claimants seek to rely on does not confer on the Claimants a right to claim for expenses incurred for processing these applications made in respect of the Vessel. I hold accordingly that the Claimants are not entitled to recover any sum under this head of damage.

43.    In view of the conclusion I have arrived above, I do not consider it necessary to decide on the points raised by the Respondents in their email of 3 April 2007 or the Claimants' response of 4 April 2007, although I have reviewed the same.

**H.** **OVERTIME CLAIM FOR PERSONNEL OF THE VESSEL AND REIMBURSEMENT CLAIM FOR PAYMENT OF CHARGES OF 85 TONNE SHACKLE AND LIFE JACKETS USED BY THE RESPONDENTS' PERSONNEL**

44. An invoice bearing reference D07/JT/DN/I/2006 for the sum of US$2,814.48 was rendered by the Claimants and addressed to the Respondents. Attached to this invoice is another invoice from the head owners with a summary of the overtime claim of the crew of the Vessel. In addition, the head owners included overtime sheets for each member of the crew, all of which contain the remark that the overtime had been approved by "CSR". "CSR" as Goh clarified at the hearing was the designation of the field manager of the Respondents when the Respondents were operating at the Udang Field. An additional document marked Tab 10B was put forward by the Claimants at the hearing to show that Udang Field was where the Vessel was deployed to work in at the material period.

45. The Claimants, through their counsel, referred me to Clause 6(a)(i) of the Charter. I do not construe Clause 6(a)(i) as expressly conferring a right on the Claimants to seek reimbursement of the overtime put in by the various members of the crew. There is at best an argument that if the work done by the crew is outside its normal scope, the charterers may be expected to pay additional sums direct to the crew. This is however very different from the Respondents having to pay the Claimants or even the head owners for any overtime work by the crew. Insofar as the claim may be classified as one of indemnity, I have not seen any evidence that the overtime was put in by the crew pursuant to a request made by the Respondents on the Claimants or any payment having been made by the Claimants. In any rate, the Statement of Case contains no plea as regards an indemnity claim.



46. In view of the foregoing, I disallow any claim for overtime charges that may have been paid to the crew members of the Vessel.

47. I turn next to the charges amounting to US$1,992.48 for shackle and life jackets. Goh's evidence that the shackle was loaned to the Respondents at Udang "A" Platform (where the Vessel was deployed by the Respondents) but the shackle was not returned. The 20 jackets were also on loan to the Respondents for use at Udang "A" Platform and were either not returned or returned in a dirty condition. Goh's evidence is corroborated by an acknowledgement dated 24 November 2005 from Eddy Iskandar who was stationed at the platform. According to the invoice 007/JT/DN/I/2006, the shackle and life jackets were used by the Respondents' personnel, from which I infer that these items were loaned to the Respondents by the Claimants. Goh's evidence is that this invoice was not challenged by the Respondents. Accordingly, I would have allowed this part of the invoice for the sum of US$1,992.48 if it can be shown that the Claimants had paid the head owners the same sum and are thereby seeking indemnification and a claim in indemnity was pleaded. There is however no evidence that payment had been made by the Claimants to the head owners which have been put forward by the Claimants.

48. I should add that the Claimants have not referred me to any provision in the Charter which creates in the Respondents an obligation to make payment. As such, the only justification for the Claimants demanding payment is that they should be indemnified for the amount they themselves have paid to the



head owners. The latter is, as stated above, not proved or pleaded. The claim for this part of the invoice accordingly also fails.

I.    **FUEL REFUND**

49.    An invoice bearing reference 025/JT/DN/II/2006 for the sum of US$13,018.17 was rendered by the Claimants to the Respondents in respect of fuel refund for the period of 25 October 2005 to 19 January 2006. Goh explained that this was in fact the amount of motor gas oil ("MGO") consumed during the charter period. Goh confirmed that this invoice has not been challenged by the Respondents. He also clarified that the unit price of the bunkers of US$553/mt was based on the amount charged to the Claimants by the head owners and which in any event, reflected the market price at the material period. I accept Goh's evidence on this issue.

50.    Clause 9 of the Charter provides that:-

"Unless otherwise agreed, the Vessel shall be delivered with bunkers and lubricants as on board and redelivered with sufficient bunkers to reach the next bunkering stage en route to her next port of call. The Charterers upon delivery and the Owners upon redelivery shall take over and pay for the bunkers and lubricants on board at the prices prevailing at the times and Ports of delivery and redelivery."

51.    Rider Clause 38 of the Charter provides that:-

"Potable water, fuel and lubricant oil shall be charged at cost reimbursable OR Charterer's supply."

52.    The effect of these clauses is that the Respondents as charterers would be responsible for bunkers consumed in the course of the charter. It is of course typical of any time charter that the time charterer is responsible for bunkers consumed during the charter period.

53.    The Respondents' failure to pay the sum of US$13,018.17 is a breach of the two provisions cited above. Accordingly, I hold that the Claimants are entitled to recover this amount from the Respondents.

## J.    REIMBURSEMENTS FOR THREE INVOICES ISSUED BY PT SAMUDERA SHIPPING SERVICES ("SAMUDERA")

54.    An invoice bearing reference 026/JT/DN/II/2006 was issued by the Claimants for the sum of Rp 102,008,390. According to Goh, this invoice was not challenged or disputed by the Respondents. This invoice itself refers to three invoices issued by Samudera. I shall deal with each of the three invoices in turn.

55.    The first invoice is for Rp 7,500,000. Goh explained that this expense was incurred in connection with the direct passage of the Vessel from Batam to Natuna. This direct passage called for certain dispensation for which a fee was payable to the Indonesian authorities. The invoice was in fact rendered in connection with this fee. Samudera, who were the Vessel's agents, incurred

these expenses on behalf of the Claimants, invoiced the Claimants, who in turn seek to recover the same from the Respondents.

56.   Under Clause 8(c), the charterers shall pay for all customs, duties, all permits, import duties and clearance expenses for the Vessel.  These expenses would have been incurred by the Claimants on behalf of the Respondents. I therefore allow the claim for Rp 7,500,000.

57.   The second invoice for the sum of Rp 15,389,800 was also incurred by Samudera in relation to the following types of expenses:-

| | | |
|---|---|---|
| (a) | inward outward clearance of the Vessel | Rp 4,000,000 |
| (b) | agency fee | Rp 2,000,000 |
| (c) | garbage disposal | Rp 500,000 |
| (d) | air ticket for crew plus service charge | Rp 662,200 |
| (e) | land transport costs for crew | Rp 200,000 |
| (f) | ferry ticket for crew plus service charge | Rp 2,657,600 |
| (g) | sea transport for crew to the Vessel | Rp 750,000 |
| (h) | shore pass for 34 crew members | Rp 1,870,000 |
| (i) | pilotage cost for berthing / unberthing of Vessel plus service charge | Rp 2,750,000 |

The Claimants rely on Clause 8(a) to support their contention that the Respondents as charterer should be responsible for these items of expenses. Clause 8(a) of the Charter provides as follows:-

"While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, dock, harbour tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, .costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise)."

58. So far as items (a) and (i) are concerned, they clearly fall within the scope of Clause 8(a).

59. The other items listed in Paragraph 57 above (consisting primarily of expenses incurred in connection with the crew) must be shown by the Claimants to come within the expression, "other dues and charges, agencies and commissions incurred on the Charterers' business ...".

60. So far as the expenses pertaining to the signing off of the two crew members are concerned, the starting point must be that these crew members were either employed by the Claimants or (as is more likely) the head owners and signing off is a usual incident of the employment of the crew. There is nothing to suggest that such signing off was somewhat related to the charterer's business.

61.  In relation to the shore passes issued to 34 crew members, I am again unable to see from the documents how they were related to the Respondents' business. If anything, these passes were arranged at the instructions of the Master of the Vessel on 14 January 2006.

62.  As far as agency fee is concerned, Samudera acted as the agent of the Vessel which therefore means that either the Claimants or the head owners would be responsible for their fees. Clause 8(a) which the Claimants rely on does not assist them. As for garbage expenses, again, I do not see how that can be considered as part of the charterer's business.

63.  To summarise then, in relation to the second invoice, I only allow the claim for items (a) and (i), which amount to Rp 6,750,000 i.e. Rp 4,000,000 plus Rp 2,750,000.

64.  I turn finally to the third invoice from Samudera for the sum of Rp 69,645,100, which relates to the following items:-

|  |  |  |
|---|---|---|
| (a) | inward outward clearance | Rp 4,000,000 |
| (b) | agency fee | Rp 2,000,000 |
| (c) | shifting permit | Rp 300,000 |
| (d) | extant shifting permit | Rp 600,000 |
| (e) | transport boat for delivery of passport | Rp 550,000 |
| (f) | exit – re-entry permit for 39 crew members | Rp 15,015,000 |
| (g) | power of attorney for 39 crew members | Rp 19,500,000 |
| (h) | sign-on expenses for 39 crew members | Rp 3,900,000 |
| (i) | transport boat for pick up for crew members | Rp 550,000 |

| | | |
|---|---|---|
| (j) | exit – re-entry permit for 1 crew member | Rp 385,000 |
| (k) | power of attorney 1 crew member | Rp 500,000 |
| (l) | sign-on expenses for 1 crew member | Rp 100,000 |
| (m) | transport boat for pick up for crew | Rp 550,000 |
| (n) | exit - re-entry permit for 38 crew members | Rp 14,630,000 |
| (o) | health book | Rp 200,000 |
| (p) | harbour dues | Rp 2,251,800 |
| (q) | quay dues | Rp 2,251,800 |
| (r) | navigation | Rp 1,737,400 |
| (s) | 10% service charge for items (p) to (r) | Rp 624,100 |

65.    I am of the view that items (a), (c), (d), (p), (q), (r) and (s) come within the scope of Clause 8(a). I accordingly allow the claim in respect of these items. The other items do not come within the scope of Clause 8(a) as they do not relate to the charterer's business. I shall add in relation to items (f), (m) and (n) that although Clause 8(c) obliges the Charterer to pay for all permits, such permits must pertain to the Vessel and/or equipment for or arising out of the Charter and as such, do not cover fees for re-entry permits of crew members. The Claimants also referred me to Clause 8(b) at the hearing. On a plain reading, I cannot see how this provision can assist the Claimants.

66.    The upshot of the foregoing finding is that the Claimants are successful in their claim for Rp 11,765,100 and not the sum of Rp 69,645,100 as stated in this third invoice.

**K.    OVERTIME CLAIM FOR CRANE OPERATOR**

67.    In light of my reasoning in Part II(h), I similarly disallow the overtime claim of US$2,200 as evidenced by the Claimants' invoice reference number 032/JT/DN/II/2006.

**L.    MISCELLANEOUS EXPENSES FOR WHICH THE CLAIMANTS SEEK REIMBURSEMENT**

68.    An invoice bearing reference 112/JT/DN/VIII/2006 for the sum of US$15,714.8 was sent by the Claimants to the Respondents. This invoice includes some pilotage fees which relate to a different vessel, "Maritime Putri". The Claimants confirm that they would not be pursuing these pilotage fees which amount to US$709.75. There are various claims pertaining to pilotage charges and agency fees of the other vessel, "Maritime Putri", which are not within the scope of this arbitration and which I do not have any jurisdiction in any event to make any award in respect of. These items add up to S$660, which works out to around US$431 (applying a conversion rate of US$1 : S$1.52).

69.    Apart from the items referred to in the foregoing paragraphs, the other items pertain to pilotage fees, port charges, harbour charges and related expenses. These items come within the scope of Clauses 8(a) and 8(c). I accordingly hold that the Respondents are liable to pay for them and in failing to do so, acted in breach of the Charter.

70.    As aforesaid, invoice bearing reference 112/JT/DN/VIII/2006 is for the sum of US$15,714.81. Deducting from that figure the sum of US$1,140.75 (i.e.

US$709.75 plus US$431), one arrives at the figure of US$14,574.06 which is the sum awarded to the Claimants under this head.

## IV. CONCLUSION

71.   Now, I, Toh Kian Sing, having carefully considered the documentary and oral evidence submitted to me, do hereby **MAKE, ISSUE AND PUBLISH THIS MY FINAL AWARD:-**

      (a)   I find that the Claimants are entitled to recover the sums of US$815,548.16 and Rp26,015,100 from the Respondents. The Respondents shall pay the sums of US$815,548.16 and Rp26,015,100 to the Claimants forthwith with interest thereon at 6% per annum from 11 May 2006 (being the date of commencement of the arbitration) up to the date of this award.

      (b)   the costs of the arbitration which is for the sum of S$24,967.52 as detailed below shall be paid in the first instance out of the deposit paid by the Claimants and/or the Respondents to the SIAC.

            Costs and Expenses of Arbitrator:   S$18,954.32

            Costs and Expenses of SIAC:    S$6,013.20

      (c)   Both parties shall be jointly and severally responsible for the full payment of the costs of the arbitration. The Respondents shall bear the costs of the arbitration and shall accordingly reimburse the

Claimants in full for such part of the costs of the arbitration as may be paid by the Claimants (from the deposit placed with SIAC).

(d)    the Respondents shall pay to the Claimants forthwith the party to party costs incurred in this Arbitration, which I hereby fix at S$16,000.

Given under my hand at Singapore, on this *13th* day of July 2007.

_____

Teh Kian Sing, SC
Sole Arbitrator

To:    The Claimants
c/o Messrs Engelin Teh Practice LLC
10 Collyer Quay #23-01
Ocean Building
Singapore 049315
Attn: Mr Harish Kumar / Mr Thomas Sim
(Ref:HK/TS/ann/14344/05/L)

The Respondents
PT Pertalahan Arnebatara Natuna
Bumidaya Plaza 21st and 23rd Floor
Jalan Imam Bonjol No. 61
Jakarta 10310, Indonesia
Attn: Mr Taufik Karmadi
(Ref: 044/PAN-SIAC/07)

The Respondents' Counsel
M/s Yan Apul & Rekan
Jl.H. Agus Salim 57
Jakarta 10340
Indonesia
Attn: Mr Yan Apul, SH
(Ref: 12520/YAR/V/06)

US$709.75 plus US$431), one arrives at the figure of US$14,574.06 which is the sum awarded to the Claimants under this head.

## IV. CONCLUSION

71. Now, I, Toh Kian Sing, having carefully considered the documentary and oral evidence submitted to me, do hereby MAKE, ISSUE AND PUBLISH THIS MY FINAL AWARD:-

(a) I find that the Claimants are entitled to recover the sums of US$815,548.16 and Rp26,015,100 from the Respondents. The Respondents shall pay the sums of US$815,548.16 and Rp26,015,100 to the Claimants forthwith with interest thereon at 6% per annum from 11 May 2006 (being the date of commencement of the arbitration) up to the date of this award.

(b) the costs of the arbitration which is for the sum of S$24,967.52 as detailed below shall be paid in the first instance out of the deposit paid by the Claimants and/or the Respondents to the SIAC.

Costs and Expenses of Arbitrator:    S$18,954.32

Costs and Expenses of SIAC:           S$6,013.20

(c) Both parties shall be jointly and severally responsible for the full payment of the costs of the arbitration. The Respondents shall bear the costs of the arbitration and shall accordingly reimburse the

Claimants in full for such part of the costs of the arbitration as may be paid by the Claimants (from the deposit placed with SIAC).

(d)     the Respondents shall pay to the Claimants forthwith the party to party costs incurred in this Arbitration, which I hereby fix at S$16,000.

Given under my hand at Singapore, on this 13th day of July 2007.

_____

Teh Kian Sing, SC
Sole Arbitrator

To:     The Claimants
        c/o Messrs Engelin Teh Practice LLC
        10 Collyer Quay #23-01
        Ocean Building
        Singapore 049315
        Attn: Mr Harish Kumar / Mr Thomas Sim
        (Ref:HK/TS/ann/14344/05/L)


        The Respondents
        PT Pertalahan Arnebatara Natuna
        Bumidaya Plaza 21st and 23rd Floor
        Jalan Imam Bonjol No. 61
        Jakarta 10310, Indonesia
        Attn: Mr Taufik Karmadi
        (Ref: 044/PAN-SIAC/07)


        The Respondents' Counsel
        M/s Yan Apul & Rekan
        Jl.H. Agus Salim 57
        Jakarta 10340
        Indonesia
        Attn: Mr Yan Apul, SH
        (Ref: 12520/YAR/V/06)